**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**
**COURT FILE NO.:  13-CV-00371 (RHK/TNL)**

Terry L. Bell,

          Plaintiff,

v.

Trans Union, LLC,
Residential Credit Solutions, Inc., and
Equifax Information Services LLC,

          Defendants.

**PLAINTIFF'S MEMORANDUM OF
LAW IN SUPPORT OF PLAINTIFF'S
MOTION FOR LEAVE TO AMEND
COMPLAINT TO PLEAD STATE
LAW PUNITIVE DAMAGES
AGAINST DEFENDANT
RESIDENTIAL CREDIT
SOLUTIONS, INC.**

## INTRODUCTION

In a barrage of mortgage servicing abuses that have continued even as this case has proceeded through litigation, Defendant Residential Credit Solutions, Inc. ("RCS"), has repeatedly demonstrated deliberate disregard for Plaintiff's rights and has proceeded to act despite admitted knowledge of the law and demonstrated knowledge of facts creating a high probability of legal injury to Plaintiff's rights.

To plead punitive damages on Minnesota state law claims, a Plaintiff must bring a motion under Minn. Stat. § 549.191. Accordingly, Plaintiff now seeks leave to amend the complaint to plead punitive damages on Minnesota law claims against RCS.

Plaintiff's state law claims fall under the Minnesota Residential Mortgage Originator and Servicer Licensing Act ("RMOSLA"), Minn. Stat. § 58.01-58.19. RMOSLA incorporates the federal Real Estate Settlement Procedures Act ("RESPA"), 12

U.S.C. § 2605.[1]  RCS's violations include failing to respond to Plaintiff's disputes and requests for information, reporting delinquencies to Plaintiff's credit reports within 60 days of receiving a qualified written request, misapplying payments, misrepresenting balances, charging bogus fees, and even adding on to Plaintiff's mortgage balance a bill that RCS had incurred to its own outside counsel for defending RCS in this lawsuit.

Plaintiff, consistent with the commands of *Ashcroft v. Iqbal*, 566 U.S. 662 (2009) and *Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) is submitting a proposed amended complaint that not only seeks relief in the form of punitive damages, but also includes the necessary factual support for that claim.  The newly detailed facts relate to punitive damages and are part and parcel of the timely proposed amendment for punitive damages.

## FACTS

RCS has been aware at least since September 17, 2010, of its obligation under Section 6 of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2605[2], to respond to consumers' qualified written requests ("QWRs").  (Goolsby Aff. ¶ 2, Ex. A ("Brouse Depo.") p. 96, ll. 12-24.)  Likewise, RCS has been aware at least since that date of its obligation not to send to any consumer reporting agency information concerning any overdue payment related to the consumer's QWR during the 60-day period following

---

[1] Plaintiff also makes claims under the federal Fair Credit Reporting Act ("FCRA").  The FCRA provides an independent basis, under federal law, for punitive damages.  *See* 15 U.S.C. § 1681n(a)(2).  Accordingly, Plaintiff already has claims for FCRA punitive damages (*see* Am. and Supl. Compl. ¶¶ 87, 92), so does not and need not seek leave in the present motion to plead punitive damages for FCRA violations.

RCS's receipt of the QWR.  (Brouse depo. p. 178 ll. 5-20.)

Plaintiff had a federally related home mortgage loan from Defendant RCS.  (Bell Aff. ¶ 2.)  In March 2011, RCS and Plaintiff agreed to a trial modification of the loan. (Bell Aff. ¶ 3.)  Plaintiff made regular monthly payments for March-August 2011, consistent with the trial loan modification agreement. (Bell Aff. ¶ 4.)  Plaintiff's payments for March-August 2011 were actually larger than the required payments under the original loan agreement.  (Bell Aff. ¶ 5.)  Plaintiff was never as much as thirty days late on the loan in February-August 2011. (Bell Aff. ¶ 6.) Nevertheless, RCS repeatedly reported to one or more credit bureaus that Plaintiff was thirty or more days delinquent in March, April, May, June, and July of 2011. (*See* Goolsby Aff. ¶ 3, Ex. B ("RCS Admissions") Nos. 12, 13, 14, 17, 18, 20, 22, 23, 24, 28.)  The indications of delinquencies in March, April, May, June, and July of 2011 were false.  (RCS Admissions No. 3.)

On or around August 20, 2011, RCS, through its agent "Tarah," stated to Plaintiff by telephone, "Do not send" the next monthly payment because it would "mess up the numbers" for the completion of the trial modification period.  (Bell Aff. ¶ 7.)

RCS improperly allocated payments between principal, interest, and escrow on Plaintiffs account.  (RCS Admissions No. 30; Bell Aff. ¶ 9.)  In September 2011, RCS, in violation of its agreements with Plaintiff, improperly withdrew several months of payments from Plaintiff's escrow and principal balance accounts; these appear as

---

[2] That part of RESPA is also known as the Servicer Act.

reversals of previously credited payments. (Bell Aff. ¶ 8.) As recently as January 15, 2014, RCS tried to claim that there had been no payment reversals. (Goolsby Aff. ¶ 4, Ex. C, RCS Responses to Interrogatories p. 10, No. 13 ("Defendants states that there were no payment reversals on Plaintiff's loan during the time period Defendants serviced Plaintiff's loan.").)

RCS overcharged Plaintiff for escrow. (RCS Admissions No. 33.) The combination of RCS's improper withdrawal of payments from Plaintiff's escrow account and subsequent monthly failures to apply sufficient amounts to escrow resulted in an RCS-created shortage in Plaintiff's escrow account. (Bell Aff. ¶ 10.) In July 2012, RCS demanded that Plaintiff pay an extra $290.68 to escrow each month. (Bell Aff. ¶ 11.)

RCS knew, prior to July 2012, that a "common" reason to need to make a credit correction was that there had been a misapplied payment. (Brouse depo. p. 139 ll. 17-20.) Likewise, RCS knew, prior to July 2012, that a "common" reason to need to do a credit correction was that a credit report showed a delinquent payment when in fact the payment had been made on time. (Brouse depo. p. 139 ll. 12-16.)

On or around July 15, 2012, Plaintiff discovered the errors in his credit report. (Bell Aff. ¶ 12.) RCS was first put on notice of problems with the account no later than on or around July 16, 2012, when Plaintiff telephoned RCS to dispute the reporting of delinquencies in 2011. (*See* RCS Admissions No. 4.)

On August 10, 2012, Plaintiff faxed a written correspondence to RCS at the fax number they had given him, requesting that RCS fix the reporting of delinquencies in March through July of 2011 (*See* Bell Aff. ¶ 13, Ex. A.)

In a letter dated August 13, 2012, RCS claimed that it was making corrections, but only stated it was correcting one month instead of all the months with delinquencies, indicated the wrong account number, and indicated the wrong year for the month it was supposedly correcting (indicating that a correction was being made to the account history for a date in the future).  (*See* Bell Aff. ¶ 14, Ex. B.)

On or about September 15, 2012, Plaintiff notified Trans Union by telephone that the indications of delinquencies on his RCS account were false. (Bell Aff. ¶ 15.)

On or about September 17, 2012, RCS was put on notice that there were still problems with the account when RCS received notice from Trans Union that Plaintiff still disputed the delinquent payment history.  (*See* RCS Admissions No. 10.)

At least by September 21, 2012, RCS knew that it had been in the wrong:  in a letter to Plaintiff of that date, RCS stated, "RCS sent the following corrections to the four major credit bureaus:  Experian, Equifax, TransUnion, and Innovis.  Account current from March 2011-September 2011.  We apologize for any inconvenience this may have caused."  (Bell Aff. ¶ 16, Ex. C.)

Nevertheless, in September, October, and November 2012, RCS again reported the account to one or more consumer reporting agencies with indications of delinquencies in March, April, May, June, and July of 2011.  (RCS Admissions Nos. 12, 13, 14.)

5

On or about December 12, 2012, RCS was again put on notice that there were still problems with the account when RCS again received notice from Trans Union that Plaintiff still disputed the delinquent payment history.  (*See* RCS Admissions No. 15.) Nevertheless, in December 2012 and January 2013, RCS again reported the account to one or more consumer reporting agencies with indications of delinquencies in March, April, May, June, and July of 2011.  (RCS Admissions Nos. 17, 18.)

RCS was again put on notice of ongoing problems with the account when RCS was served with the present lawsuit on February 15, 2013. (*See* RCS Admissions No. 19; Brouse depo p. 163 l. 24 – p. 164 l. 4.)  Nevertheless, in February, March, April and May 2013, RCS again reported the account to one or more consumer reporting agencies with indications of delinquencies in March, April, May, June, and July of 2011.   (RCS Admissions Nos. 20, 22, 23, 24.)

RCS knew when this lawsuit was served on February 2013 that there were still problems with the credit reporting (*see* RCS Admissions No. 19), but RCS did not assign anyone to figure it out until approximately August 20, 2013 (Brouse depo p. 163 l. 4 – p. 164 l. 4).

RCS failed to send Plaintiff billing statements for April and May of 2013.  (Brouse depo. p. 160 l. 1 – p. 161 l. 14.)

On or about June 1, 2013, RCS was again put on notice that there were still problems with the account when RCS received notice from Equifax that Plaintiff still disputed the delinquent payment history.  (*See* RCS Admissions No. 25.)  Nevertheless,

on or about June 30, 2013, RCS reported the account to one or more consumer reporting agencies with indications of delinquencies in March, April, May, June, and July of 2011. (*See* RCS Admissions No. 28.)

On or about June 4, 2013, Plaintiff sent to RCS a qualified written request for information on his current balance and payments.  (*See* Bell Aff. ¶ 17, Ex. D.) RCS received Plaintiff's qualified written requests, and indicated to Mr. Bell that RCS was going to respond.  (*See* Bell Aff. ¶ 19, Ex. F.)  But RCS chose not to respond. (*See* Brouse depo. p. 106 ll. 19-25.)

 On or about June 12, 2013, Plaintiff sent to RCS a qualified written request for RCS to correct errors in Plaintiff's escrow account.  (*See* Bell Aff. ¶ 18, Ex. E.)  RCS again chose not to respond. (*See* Brouse depo. p. 108 l. 24 – p. 109 l. 2.)

On or about June 18, 2013, Plaintiff sent to RCS a qualified written request for RCS to correct errors in Plaintiff's escrow account.  (*See* Bell Aff. ¶ 20, Ex. G.)  RCS yet again chose not to respond. (*See* Brouse depo. p. 109 ll. 7-13.)

On or about July 8, 2013, Plaintiff sent to RCS a qualified written request for RCS to correct errors relating to escrow, interest, and principal in Plaintiff's account.  (*See* Bell Aff. ¶ 21, Ex. H.)  RCS yet again chose not to respond. (*See* Aff. ¶ 34.)

RCS sent Plaintiff a "Late Notice," dated July 17, 2013, stating that RCS had not received Plaintiff's loan payment.  (*See* Bell Aff. ¶ 23, Ex. I.)  The statement in RCS's July 17, 2013, Late Notice that RCS had not received Plaintiff's loan payment was false. (Bell Aff. ¶ 24.)  RCS had received Plaintiff's July 2013 payment by certified mail and

had cashed the check prior to sending the July 17, 2012 "Late Notice").  (*See* Bell Aff. ¶ 25, Ex. J (certified mail receipt); ¶ 26, Ex. K (delivery tracking record); ¶ 27, Ex. L (Plaintiff's bank statement, showing that RCS had cashed the check).)   Nevertheless, RCS assessed Plaintiff a "late charge" of $88.81. (*See* Bell Aff. ¶ 28, Ex. M.)   Then RCS sent Plaintiff a letter, dated July 22, 2013, again falsely stating that RCS had not received Plaintiff's loan payment.  (*See* Bell Aff. ¶¶ 29-30, Ex. N.)

On August 16, 2013, RCS billed Plaintiff an amount that RCS had incurred to its own outside counsel for defending RCS in this lawsuit. (*See* Bell Aff. ¶ 31, Ex. O; Brouse Depo. p. 128 l. 14 – p. 129 l. 4.)  The spurious August 16, 2013, charge appeared on the August 17, 2013, monthly billing statement for Plaintiff's RCS mortgage as a "Misc[ellaneous] Fee Billed" of $1,960.00. (Bell Aff. ¶ 31, Ex. O.)

On or about September 3, 2013, Plaintiff sent to RCS a qualified written request for RCS to correct errors relating to escrow, interest, and principal in Plaintiff's account, and to correct the spurious "Misc[ellaneous] Fee Billed" of $1,960.00.  (*See* Bell Aff. ¶ 32, Ex. P.)  RCS yet again chose not to respond. (Brouse depo. p. 127 l. 13 – p. 128 l. 4.)

Other than acknowledgments from RCS that it received his qualified written requests, Plaintiff has never received responses to any of his 2013 qualified written requests. (Bell Aff. ¶ 34.)

RCS transferred the servicing of Plaintiff's loan to another servicer, effective September 12, 2013. (*See* Bell Aff. ¶ 35.)  RCS passed along to the new servicer a

substantially inflated account balance, a deflated escrow balance, and other false information upon transferring servicing. (Bell Aff. ¶ 36.)

RCS has not responded to the new servicer's inquiries regarding the $1960 discrepancy. (*See* Brouse depo. p. 188 l. 5 – p. 189 l. 3.)

## ARGUMENT

### I.   LEGAL STANDARD

The Minnesota Residential Mortgage Originator and Servicer Licensing Act, Minn. Stat. § 58.01-58.19 ("RMOSLA"), expressly provides that a Defendant must pay "punitive damages if appropriate, as provided in sections 549.191 and 549.20." Minn. Stat. § 58.18, subd. 1(3).   RMOSLA incorporates federal law:  in addition to its own express consumer protections, RMOSLA also provides that a violation of "any provision of any other applicable state or federal law regulating residential mortgage loans" constitutes a violation of RMOSLA.  Minn. Stat. § 58.13, subd. 1(8).  Accordingly, when the standards of Sections 549.191 and 549.20 are met, punitive damages are available under Minnesota law not only for independent violations of RMOSLA, but also for violations of the federal RESPA, including 12 U.S.C. § 2605.[3]

Section 549.191 provides that to plead punitive damages on Minnesota state law claims, a party must make a motion:

---

[3] Although RESPA does not itself provide for punitive damages, RESPA expressly provides that state laws are allowed to "give[] greater protection to the consumer." 12 U.S.C. § 2616.

> Upon commencement of a civil action, the complaint must not seek punitive damages. After filing the suit, a party may make a motion to amend the pleadings to claim punitive damages. The motion must allege the applicable legal basis under Section 549.20 or other law for awarding punitive damages in the action and must be accompanied by one or more affidavits showing the factual basis for the claim. At the hearing, if the court finds *prima facie* evidence in support of the motion, the court *shall* grant the moving party permission to amend the pleadings to claim punitive damages.

Minn. Stat. § 549.191 (emphasis added).

Ultimately, punitive damages may be *awarded* upon "clear and convincing evidence" in support of punitive damages. Minn. Stat. § 549.20, subd. 1(a). However, Plaintiff is not at this stage asking to be *awarded* punitive damages, but merely to *plead* them. To obtain leave to amend for punitive damages, "(a) plaintiff need only prove that she is entitled to *allege* such damages, not that she is actually entitled to them." *Ulrich v. City of Crosby*, 848 F. Supp. 861, 867 (D. Minn. 1994).

For a plaintiff to be entitled to *allege* punitive damages, the court need only find prima facie evidence in support of, and a legal basis for, the punitive damages claim. *Ulrich*, 848 F. Supp. At 867; § 549.191; *see also Swanlund v. Shimano Ind. Corp., Ltd.*, 459 N.W.2d 151, 154 (Minn. Ct. App. 1990). Minnesota courts have explained, "Prima facie evidence is evidence which, if unrebutted, would support a judgment in the party's favor." *McKenzie v. Northern States Power Co.*, 440 N.W.2d 183, 184 (Minn. Ct. App. 1989).

In making its determination on a motion to amend for punitive damages, the court "makes no credibility rulings, nor does the Court consider any challenge, by cross-examination or otherwise, to plaintiff's proof." *Swanlund*, 459 N.W.2d at 154. Evidence

submitted in opposition shall not be considered for the purpose of a punitive damages motion. *Northwest Airlines, Inc. v. American Airlines, Inc.*, 870 F. Supp. 1499 (D. Minn. 1994).

That which a plaintiff must show prima facie evidence of (and ultimately clear and convincing evidence of at trial) is "acts of the defendant [that] showed deliberate disregard for the rights or safety of others." Minn. Stat. § 549.20. subd. 1(a). The statute explains:

> A defendant has acted with deliberate disregard for the rights or safety of others if the defendant has knowledge of facts or intentionally disregards facts that create a high probability of injury to the rights or safety of others and:
> (1) deliberately proceeds to act in conscious or intentional disregard of the high probability of injury to the rights or safety of others; or
> (2) deliberately proceeds to act with indifference to the high probability of injury to the rights or safety of others.

Minn. Stat. § 549.20. subd. 1(b). Deliberate disregard does not require the highest level of malicious or intentional behavior. Hearings on S.F. 1829 before the Subcomm. on Civil Law of the Senate Comm. on Judiciary, 74th Legis., (Feb. 21, 1990) (statement of Sen. Morrow).

Thus, whether there is in fact clear and convincing evidence of a defendant's deliberate disregard for the rights or safety of others will be ultimately a question for the trier of fact. At this stage, a court need only find that the plaintiff's prima facie evidence – without regard for the defendant's evidence – is such that a reasonable jury *could* conclude that there is clear and convincing evidence of a deliberate disregard.

This Court has acknowledged, "[R]ealistically, proof of a deliberate disregard will infrequently be revealed in an inculpatory admission by a defendant. . . . [C]ircumstantial showings can serve, as readily as direct admissions, as the predicate for punitive damages." *Berczyk v. Emerson Tool Co.*, 291 F. Supp. 2d 1004, (D. Minn. 2003).

Under the Federal Rules of Civil Procedure, a pleading seeking relief must set forth facts to support that claim for relief. *Ashcroft v. Iqbal*, 566 U.S. 662, 678 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Thus, a party seeking to amend to plead punitive damages is not only permitted but *required* by federal law to include in the proposed complaint the facts that support punitive damages. Indeed, a court may dismiss a pleading for failure to state a claim *sua sponte*. *See Taylor v. Acxiom Corp.*, 612 F.3d 325, 340 (5th Cir. 2010).

Under Minnesota law, factors bearing on punitive damages include:

> the seriousness of hazard to the public arising from the defendant's misconduct, the profitability of the misconduct to the defendant, the duration of the misconduct and any concealment of it, the degree of the defendant's awareness of the hazard and of its excessiveness, the attitude and conduct of the defendant upon discovery of the misconduct, [and] the number and level of employees involved in causing or concealing the misconduct.

Minn. Stat. § 549.20, subd. 3. The Minnesota Supreme Court has pronounced that it is "appropriate, in determining whether punitive damages should be allowed, to focus on the wrongdoer's conduct rather than to focus on the type of damage that results from the conduct." *Jensen v. Walsh*, 623 N.W.2d 247, 251 (Minn. 2001) (emphasis added) (internal citations omitted).

## II. PLAINTIFF'S MOTION FOR LEAVE TO PLEAD PUNITIVE DAMAGES ON STATE LAW CLAIMS SHOULD BE GRANTED BECAUSE PRIMA FACIE EVIDENCE, BOTH DIRECT AND CIRCUMSTANTIAL, SHOW THAT RCS KNEW THE FACTS AND KNEW THE LAW AND REPEATEDLY DELIBERATELY DISREGARDED THEM.

A consumer has a right under RESPA, which is incorporated into Minnesota law,

to receive a written response from a servicer to the substance of the consumer's qualified

written request:

> (2) Action with respect to inquiry
> Not later than 30 days (excluding legal public holidays, Saturdays, and Sundays) after the receipt from any borrower of any qualified written request . . . and, if applicable, before taking any action with respect to the inquiry of the borrower, the servicer shall—
> (A) make appropriate corrections in the account of the borrower, including the crediting of any late charges or penalties, and transmit to the borrower a written notification of such correction (which shall include the name and telephone number of a representative of the servicer who can provide assistance to the borrower);
> (B) after conducting an investigation, provide the borrower with a written explanation or clarification that includes—
> (i) to the extent applicable, a statement of the reasons for which the servicer believes the account of the borrower is correct as determined by the servicer; and
> (ii) the name and telephone number of an individual employed by, or the office or department of, the servicer who can provide assistance to the borrower; or
> (C) after conducting an investigation, provide the borrower with a written explanation or clarification that includes—
> (i) information requested by the borrower or an explanation of why the information requested is unavailable or cannot be obtained by the servicer; and
> (ii) the name and telephone number of an individual employed by, or the office or department of, the servicer who can provide assistance to the borrower.

12 U.S.C. § 2605(e)(2).  A servicer may thus comply by doing (A), (B), or (C), but each

includes a requirement that the servicer respond in writing to the substance of the

consumer's dispute within 30 days. § 2605(e)(2)(A) (requiring a "written notification of correction); §§ 2605(e)(2)(B) and -(C) (each requiring "a written explanation or clarification"). This requirement for a substantive written response is in addition to the separate requirement for the servicer to acknowledge receiving the dispute. *See* 12 U.S.C. § 2605(e)(1)(a). A servicer's written acknowledgement of receipt of the request therefore does not suffice for compliance with Section (e)(2).

RESPA also more generally requires servicers to "take timely action to respond to a borrower's requests to correct errors relating to allocation of payments . . . or other standard servicer's duties." 12 U.S.C. § 2605(k)(1)(C). Similarly, under Minnesota's RMOSLA statute, "A licensee or exempt person must investigate and attempt to resolve complaints made regarding acts or practices subject to the provisions of this chapter." Minn. Stat. § 58.14, subd. 3.

RSC had full knowledge of Section 2605(e)(2) (Brouse depo. p. 96, ll. 12-24), yet consistently violated it: Plaintiff sent qualified written requests to RCS on June 4, June 12, June 18, July 8, and September 3, 2013. (Bell Aff. ¶¶ 17, 18, 20, 21, 32, Exs. D, E, G, H, P.) RCS did not provide substantive written responses to any of them. (Bell Aff. ¶ 34.) At least once, RCS promised it was going to respond (*see* Bell Aff. ¶ 19, Ex. F) but did not.

RESPA also prohibits reporting late payments to credit bureaus for 60 days after they have been disputed in a qualified written request:

(3) Protection of credit rating

> During the 60-day period beginning on the date of the servicer's receipt from any borrower of a qualified written request relating to a dispute regarding the borrower's payments, a servicer may not provide information regarding any overdue payment, owed by such borrower and relating to such period or qualified written request, to any consumer reporting agency (as such term is defined under section 1681a of title 15).

12 U.S.C. § 2605(e)(3).

Again, RSC had full knowledge of that provision of RESPA (Brouse depo. p. 178 ll. 5-20.), yet violated it:  in September 2012, RCS reported delinquencies within 60 days of Plaintiff's August 10, 2012 request (*see* Bell Aff. ¶ 13, Ex. A; RCS Admissions Nos. 12).

RMOSLA expressly grants a borrower a right to have the servicer perform in accordance with their written agreements.  Minn. Stat. § 58.13, subd. 1(5), and prohibits a servicer from "mak[ing] or caus[ing] to be made, directly or indirectly, any false, deceptive, or misleading statement or representation in connection with a residential loan transaction."  Minn. Stat. § 58.13, subd. 1(9).

RCS violated those RMOSLA provisions in multiple ways. RCS improperly allocated payments between principal, interest, and escrow on Plaintiffs account. (RCS Admissions No. 30; Bell Aff. ¶ 9.)   In September 2011, RCS, in violation of its agreements with Plaintiff, improperly withdrew several months of payments from Plaintiff's escrow and principal balance accounts; these appear as reversals of previously credited payments.  (Bell Aff. ¶ 8.)   As recently as January 15, 2014, RCS tried to conceal the payment reversals by denying that they happened. (RCS Responses to Interrogatories p. 10, No. 13.)  RCS's statement that Plaintiff should not send a particular

15

monthly payment because it would "mess up the numbers" was misleading because whether RCS would "mess up the numbers" was within RCS's control, independent of whether Plaintiff sent a monthly payment.  RCS failed to send Plaintiff billing statements for April and May of 2013.  (Brouse depo. p. 160 l. 1 – p. 161 l. 14.)  RCS falsely claimed that Plaintiff had been late in July 2013, and imposed a bogus late charge. (*See* Bell Aff. ¶¶ 23-30, Exs. I-N.)  RCS passed along to the new servicer a substantially inflated account balance, a deflated escrow balance, and other false information upon transferring servicing. (Bell Aff. ¶ 36.)

Most shockingly, RCS billed Plaintiff an amount that RCS had incurred to its own outside counsel for defending RCS in this lawsuit. (*See* Bell Aff. ¶ 31, Ex. O; Brouse Depo. p. 128 l. 14 – p. 129 l. 4.)  Such conduct smacks of retaliation.  RCS deceptively concealed the nature of this charge by calling it a "Misc[ellaneous] Fee Billed" of $1,960.00.  (Bell Aff. ¶ 32, Ex. P.)  RCS claims to have eventually fixed that charge, but when the new servicer subsequently raised questions about an apparent ongoing $1960 discrepancy, RCS evidently did not respond.  (*See* Brouse depo. p. 188 l. 5 – p. 189 l. 3.)

III.    OTHER WRONGS ARE RELEVANT.

Evidence of other wrongs is admissible to show "motive, . . . intent, . . . knowledge, . . . or absence of mistake or accident."  Fed. R. Ev. 404(b).  Information related to other similar claims against the same defendant is relevant to claims for

punitive damages. *Jensen v. Astrazeneca LP*, Civil No. 02-4844 (JRT/FLN) (D. Minn. 2004).

Accordingly, evidence of other RCS wrongs, even if they do not constitute state law violations, are relevant to the present motion because they show that (1) RCS's state law violations were not isolated errors, but part of a larger pattern of disregard for Plaintiff's rights; and (2) RCS disregarded ample notice of its problems.

RCS repeatedly falsely reported that Plaintiff was thirty or more days delinquent in March, April, May, June, and July of 2011. (*See* RCS Admissions No. 12, 13, 14, 17, 18, 20, 22, 23, 24, 28.)  This despite that RCS knew the information was false at least by September 21, 2012 (*see* Bell Aff. ¶ 16, Ex. C) and was repeatedly put on notice of ongoing problems with its credit reporting on Plaintiff's account.  (RCS Admissions No. 4, 10, 15, 19, 25; Bell Aff. ¶ 13, Ex. A.)  RCS knew when this lawsuit was served on February 2013 that there were still problems with the credit reporting (*see* RCS Admissions No. 19), but did not assign anyone to figure it out until approximately August 20, 2013 (Brouse depo p. 163 l. 4 – p. 164 l. 4).

## CONCLUSION

Plaintiff has presented a mountain of prima facie evidence showing that Plaintiff should at least be allowed to plead punitive damages.  Both the nature and sheer number of RCS's wrongs would support a reasonable jury finding that RCS acted with deliberate disregard for Plaintiff's rights.  Accordingly, Plaintiff's Motion for Leave to Amend

Complaint to Plead State Law Punitive Damages Against Defendant Residential Credit Solutions, Inc., should be granted in its entirety.


Dated:         4/2/14                                          **GOOLSBY LAW OFFICE, LLC**

                                                               By:           s/John H. Goolsby
                                                               John H. Goolsby, #0320201
                                                               2701 University Avenue SE, Suite 209
                                                               Minneapolis, MN 55414
                                                               Telephone:  (612) 331-8700
                                                               jgoolsby@goolsbylawoffice.com
                                                               **Attorney for Plaintiff**